Anthony FIGUEROA, Petitioner,

v.

Thomas RICKS, Superintendent of Upstate Correctional Facility, Respondent.

No. 01–CV–6274.

United States District Court, W.D. New York.

March 29, 2005.

Howard Broder, Rochester, NY, for Petitioner.

Loretta S. Courtney, Monroe County District Attorney's Office, Rochester, NY, for Respondent.

## DECISION AND ORDER

BIANCHINI, United States Magistrate Judge.

## INTRODUCTION

Petitioner Anthony Figueroa ("Figueroa"), represented by counsel, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his felony murder convictions in New York State Supreme Court (Monroe County). The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Franklin Cedeno ("Cedeno") was shot to death in his Rochester apartment during an attempted robbery on July 26, 1996. The police picked up Figueroa for questioning in the matter on September 4, 1996, after his fingerprints were found on certain items of physical evidence linked to the crime. During his interrogation, Figueroa orally admitted that he had participated in the robbery, but stated that his friend, William Sanchez ("Sanchez"), was the gunman.

On October 1, 1996, Figueroa was arraigned on one count of felony murder and two counts of attempted first degree robbery. The indictment accused Figueroa, either directly as an accomplice, of causing the death of Cedeno while attempting to rob him of money and illegal drugs at his

home. Sanchez, who had been interrogated and arrested on July 29, 1996, was indicted separately.

Following an inspection of the grand jury minutes, the trial court issued a written decision dated October 23, 1996, dismissing both counts of attempted robbery for lack of proof of corroboration. The court declined to dismiss the felony murder charge, however.

A suppression hearing was held on November 18, 1996, and November 21, 1996, to determine the admissibility of the oral statement Figueroa allegedly made to the police. At the close of testimony, the court ruled that Figueroa's statement was made after a knowing and voluntary waiver of his rights and that it could be admitted into evidence. The court also issued a written decision denying the suppression of Figueroa's inculpatory statement. *See* A.159–60.[1]

During the course of the pre-trial proceedings, the prosecutor moved to consolidate Figueroa's case with that of his co-defendant. The prosecutor primarily argued that a joint trial was warranted because the two defendants rendered "interlocking" confessions. *See* A.150. In opposition, defense counsel highlighted the differences between the statements; Figueroa's confession, for instance, placed him nowhere near the location of the actual shooting, but Sanchez's statement indicated that Figueroa had engaged in a direct confrontation with the victim. *See* A.154. On December 10, 1996, the court summarily ruled that the cases would not be consolidated. *See* A.48.

Figueroa did not testify at his jury trial, held on March 6 through March 12, 1997.

The prosecution introduced proof that shortly after midnight on July 26, 1996, neighbors heard gunshots emanating from Cedeno's apartment at 63 Jacob Street. T.230.[2] The neighbors attempted to enter Cedeno's apartment, but they were unable to break down the locked doors. As they were standing in the driveway, the neighbors spotted a shadow inside Cedeno's apartment moving from the dining room to the living room. T.237–38. Seconds later, a young woman later identified as Lisziada "Lissy" Diaz appeared on the porch. She led the neighbors to the deceased Cedeno, who was lying face-down on the kitchen floor with bullet holes in his back. T.239–43.

Inside Cedeno's bedroom the police found about a kilogram of cocaine divided into two blocks, along with a bundled-up piece of duct tape. On the sidewalk near 80 Jacob Street, just up the way from Cedeno's residence, the police found a roll of duct tape. T.309. Laboratory analysis revealed Figueroa's right thumb print on the roll of tape found on the sidewalk. T.373–75. The prosecution's forensics expert testified that the bundled-up piece of tape discovered in Cedeno's apartment and the roll of tape were "most probably" made by the same manufacturer. T.409. However, the expert also testified that, at the time, only three manufacturers produced about 90% of all duct tape on the market. T.418.

The expert further testified that the torn end of the piece of duct tape found in the bedroom did not match the torn end on the roll, but he stated that a missing piece of tape could account for the discrepancy. T.414–15. The expert acknowledged that he could not say whether the piece of tape

1. Citations to "A.___" refer to the Appendix of Exhibits submitted by respondent in connection with its answer to the instant habeas petition.

2. Citations to "T.___" refer to the trial transcript.

found in the bedroom in fact came from the roll of tape discovered on the sidewalk. T.418–19.

Investigator Beaudrault of the Rochester Police Department testified that on July 26 and July 27, 1996, she met with Lissy Diaz who surrendered a black leather wallet belonging to Cedeno. T.503. Investigator Beaudrault testified that she met with Sanchez on July 29 and July 30, 1996. On July 30, 1996, she had police technicians compare the latent fingerprints found on the duct tape against Figueroa's known prints on file. T.504.

On September 4, 1996, Figueroa was picked up and brought to the police station for questioning. T.504–07. According to the arresting officers, Figueroa attempted to flee when they pulled over the car in which he was riding. Figueroa was apprehended after a brief foot chase. T.463–66.

Investigator Beaudrault related that Figueroa initially denied any involvement in the crime. T.514. During the course of the interrogation, she told Figueroa that Sanchez had implicated him as the gunman. T.515–16. Figueroa retorted that Sanchez had made no such statement because he (Figueroa) knew what was in Sanchez's statement. T.516. Soon thereafter, Figueroa said to Investigator Beaudrault, " 'I'll tell you my side of the story. I'm tired, feel bad about what happened ... I'll tell you just my side of the story.' " T.516.

According to Investigator Beaudrault, Figueroa then gave an oral confession in which he claimed that Lissy Diaz and an unnamed "second girl" planned the robbery. The plan was that Diaz would let Figueroa and Sanchez into Cedeno's apart-

ment, and then they would tie Diaz up with duct tape so she would appear to have been a victim. T.517. Once they arrived at Cedeno's apartment, they were supposed to have gone in through window, but Diaz let them in through the front door instead. Figueroa stated that the plan went awry when a fight broke out between Sanchez and Cedeno in the kitchen. Figueroa claimed to have been in the bedroom area when he heard a shot from the kitchen where Sanchez and Cedeno were fighting. T.517. Figueroa said that he panicked and then he and Sanchez both fled.

Figueroa stated that he brought duct tape with him in order to tie up Diaz. He carried the revolver, and Sanchez had the automatic. T.517–18. They had targeted Cedeno because he supposedly had drugs and money in his apartment. T.518. Investigator Beaudrault testified that Figueroa refused to give a written statement because he did not want anyone else reading it. T.519–20.

For reasons which are discussed later in this opinion, defense counsel made the decision to adopt Investigator Beaudrault as his witness for the purpose of introducing the written and oral statements allegedly made by Sanchez, along with the *Miranda* waiver card signed by Sanchez. Investigator Beaudrault testified that Sanchez orally admitted that he and Figueroa decided to break into Cedeno's apartment in order to steal drugs and money from him. T.535–36. According to Investigator Beaudrault, Sanchez agreed to give a written confession but did not want Figueroa's name mentioned in the statement. Indeed, Sanchez's written statement refers only to "my friend." T.536.[3]

---

3. Sanchez's statement read in pertinent part as follows: "On July 25th 1996 ... I was at the store at the corner of Carter Street and Roycroft Street. I was there with a friend whose name I do not want to mention. My

friend told me that these girls had something for us. ... [T]he two bitches that he was talking about came up to the store. The two girls['] names were Lissy and Jeanne. These two girls stated to us that they knew this dude

The defense called Figueroa's mother, Sandra Lopez ("Lopez"), who testified that at about 5:30 p.m. on July 25, 1996, Sanchez came over to see Figueroa at their house. After speaking with Sanchez briefly, Figueroa asked his mother if they had any tape. T.580. Figueroa then went downstairs, retrieved a roll of duct tape, and put it in the bag that Sanchez was carrying. T.580–81. Lopez testified that Sanchez "left in a hurry" after about fifteen minutes. T.581.

At about 8 p.m., as Lopez was returning home in her car, she saw Sanchez standing on the corner of Roycroft and Carter Streets in front of a store. Lopez testified that Sanchez was standing with two girls and a "kind of dark skin [sic] black guy." T.581–82. Lopez indicated that her son was not with them. T.582. After Lopez testified, the defense rested.

The jury returned a verdict convicting Figueroa of felony murder. He was sentenced to an indeterminate term of incarceration of 20 years to life.

On direct appeal, Figueroa argued that he did not receive the effective assistance of counsel because his attorney (1) chose to use Sanchez's statements as part of the defense; (2) failed to prove suppression of Figueroa's statement on the ground that he was denied his right to counsel; (3) failed to object to prejudicial hearsay; (4) failed to object to testimony that Figueroa had an illegitimate child; (4) failed to object to improper prosecutorial remarks; and (5) took a position adverse to Figueroa at sentencing. Figueroa also asserted that various evidentiary errors occurred and that the prosecutor committed misconduct. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on February 10, 1999. *People v. Figueroa*, 258 A.D.2d 960, 685 N.Y.S.2d 506 (4th Dept.1999). The New York Court of Appeals denied leave to appeal on April 7, 1999. *People v. Figueroa*, 93 N.Y.2d 899, 689 N.Y.S.2d 711, 711 N.E.2d 987 (N.Y. 1999).

who had mad money and dope, and that me and my friend should rob him. . . . We sat by the garbage cans [in front of Cedeno's house] for about half an hour, and then we heard a knock on the window and it was Lissy. She opened the window and told us to go to the front door. When we got to the front door, she opened it[.] . . . She told us that the dude was in the shower, and she walked back to the room. Me and my friend went to the shower and opened the curtain and told them to put his hands up. The dude put his hands up and my friend hit the dude with the gun over his head. The dude comes out of the shower, and I told him to turn around and sit down. While the dude is coming out of the shower my friend went into the bedroom and wrapped Lissy, or tied Lissy's hands in front of her with tape, and also her feet. Then my friend brings Lissy out by the bathroom. This was to pretend that we were going to shoot Lissy. I told the dude to give me the stuff after he asked had he [sic] what I wanted. I pointed my gun at Lissy when I said this. This is when the dude went toward my

friend's gun and he got it from him. The dude then started coming after me with the gun. I grabbed the gun by the barrel, which he was holding in his right hand. The dude was hitting me on the head with his other hand. This is when I let go of a shot and the dude was shot in his stomach. The dude fell to the ground on his stomach. We were in the kitchen when the dude was shot. The dude still had the gun in his hand and he grabbed my feet. He started pulling himself up with the gun in his hand and started pointed the gun at me. I got scared because I knew he was going to shoot. I tried to get away from him but he was holding me too tight. I got real scared and panicked, and this is when I let off four more rounds and shot the dude in his back. The dude screamed, and Lissy yelled to my friend to pick up the gun and not to forget the gun. My friend grabbed the gun and we ran out. The plan was to just go in and get money and leave. We never meant to shoot him. . . ." T.546–48.

Figueroa next challenged his representation at trial by means of a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 filed on March 16, 2000 ("the C.P.L. § 440.10 motion"). He claimed that (1) he was improperly denied the right to testify at trial; (2) he was denied the right to counsel during his interrogation about the Cedeno murder because, at the time, he had a City Court drug charge pending for which he was represented by counsel; (3) trial counsel failed investigate Figueroa's alibi defense; (4) trial counsel failed to object when one of the jurors fell asleep during trial; (5) trial counsel erred in introducing co-defendant's statements into evidence; (6) trial counsel made detrimental statements at sentencing which placed Figueroa at the scene of the crime. On June 29, 2000, the trial court issued a written decision denying all of Figueroa's claims except two issues upon which he granted a hearing: the denial of the right to testify and counsel's failure to investigate the alibi defense. *See* A.229–36.

Following the hearing, the trial court rejected both claims in a written decision and order. *See* A.237–42. The court found that defense counsel's testimony that he had advised Figueroa about his right to testify was more credible than the testimony of Figueroa and his witnesses, especially because counsel's testimony was corroborated by his notes taken during their meetings. *See* A.239–40. With respect to the issue concerning the alibi de-

fense, the court found that, among other things, there was no testimony from the alleged alibi witnesses as to the content of their purported testimony. The court determined that it was logical for defense counsel not to call the alleged witnesses inasmuch as counsel's notes reflected that Figueroa apparently admitted to being present at the scene of the homicide. *See* A.241–42. On February 23, 2001, the Appellate Division, Fourth Department, denied leave to appeal denial of the C.P.L. § 440.10 motion.

This Federal habeas petition followed.[4] For the reasons set forth below, the petition is denied.

## DISCUSSION

### Timeliness

■ Pursuant to AEDPA,[5] petitioners seeking review of their state court convictions have one year from the date on which their convictions became final to file for habeas relief in Federal court. *See* 28 U.S.C. § 2244(d)(1). Respondent argues that Figueroa's petition was not timely filed under the statute.

Figueroa argues, and respondent agrees, that under ' § 2244(d)(2),[6] the C.P.L. § 440.10 motion tolled the statute of limitations while it was pending in state court. The parties disagree, however, as to the meaning of "pending" for purposes of § 2244(d)(2). Respondent asserts that the C.P.L. § 440.10 motion ceased to be

---

4. Figueroa's habeas petition includes a claim that counsel was ineffective because he allegedly took a position adverse to Figueroa's interests at sentencing. Figueroa's counsel has indicated, however, that Figueroa does not seek re-sentencing as a remedy in this *habeas proceeding and wishes to withdraw the sentencing issue.* *See* Petitioner's Memorandum of Law at 2 n. 1 (Docket # 6).

5. Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996).

6. Section 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

pending when it was denied by the *nisi prius* court on October 23, 2000. Figueroa asserts that the C.P.L. § 440.10 motion remained pending until the intermediate state appellate court denied leave to appeal on February 23, 2001. If respondent is correct, then Figueroa's petition is untimely.

 As Figueroa correctly notes, the Second Circuit clearly has ruled that a state court post-conviction proceeding is "pending" within the meaning of § 2244(d)(2) until it is finally disposed of and further appellate review is unavailable. *Bennett v. Artuz*, 199 F.3d 116, 119–20 (2d Cir.1999), *aff'd*, 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). In this case, Figueroa was entitled to seek leave to appeal the denial of his C.P.L. § 440.10 motion to the Appellate Division of New York State Supreme Court. *See* N.Y.Crim. Proc. Law § 450.15(1) (Defendant is entitled to seek certificate for leave to appeal "[a]n order denying a motion, made pursuant to section 440.10, to vacate a judgment[.]"). Thus, Figueroa is correct that the C.P.L. § 440.10 motion continued to be "pending" until February 23, 2001, and therefore tolled the statute of limitations during that time. As a result, Figueroa's petition is timely under AEDPA.

### Standard of Review

 Because the filing of this petition post-dates the enactment of AEDPA, that statute's deferential standard of review applies to this Court's consideration of the petition. Now, a federal court cannot grant habeas relief in a case in which there was an adjudication on the merits in a state court proceeding unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1);

*see also Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

### Merits of the Petition

## I. Ineffective assistance of trial counsel

### A. Legal standard

 "A defendant seeking to overturn a conviction on the ground of ineffective assistance of counsel bears a heavy burden." *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir.2004). In order to obtain habeas relief, the petitioner must demonstrate both (1) that counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment," *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and (2) that counsel's ineffectiveness prejudiced the petitioner, *id.* at 694, 104 S.Ct. 2052. A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must over come the presumption that, under the circumstances, the challenged action 'might be considered sound [legal] strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

 If the petitioner is able to overcome the strong presumption of reasonable conduct, he must also demonstrate that his attorney's "deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

■ The Supreme Court has counseled that these principles "do not establish mechanical rules." *Id.* at 696, 104 S.Ct. 2052. The focus of the reviewing court's inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability accorded to state criminal trials, the result is unreliable because of a breakdown of the adversarial process. *Id.* Errors by counsel must be judged in the aggregate rather than in isolation, and the reviewing court must "look at the 'totality of the evidence before the judge or jury.'" *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052).

### B. Alleged errors by counsel

### 1. Prejudicial decision to introduce co-defendant's statements at trial

On direct appeal, the state court denied Figueroa's ineffective assistance claim, stating

> We reject the contention of defendant that he was denied effective assistance of counsel as a result of defense counsel's seeking to admit the oral and written statements of a codefendant who was tried separately. Defense counsel

articulated a reasonable strategic basis for the admission of the statements. Defendant failed to establish the absence of strategic or other legitimate explanations for counsel's failure to move to suppress based upon the denial of defendant's right to counsel. Upon our review of the record, we conclude that defendant received meaningful representation.

*People v. Figueroa,* 258 A.D.2d at 960, 685 N.Y.S.2d 506 (citations and internal quotations omitted).

■ Figueroa's principal contention is that defense counsel engaged in "objectively unreasonable lawyering" by introducing into evidence the oral and written statements of co-defendant Sanchez.[7] As Figueroa points out, the oral statement inculpated him specifically, while the written statement simply referred to Sanchez's confederate as a "friend."

Some background as to the defense theory of Figueroa's case is in order before proceeding. According to the police, Sanchez became a suspect within a few days of the crime. During his interrogation, Sanchez orally admitted to being the gunman, and he named Figueroa as his accomplice.

---

7. Alternatively, Figueroa argues that the Appellate Division's holding that he received "meaningful representation" in accordance with the standards expressed in *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981), is "contrary to" those articulated in *Strickland,* the clearly established Supreme Court precedent governing the disposition of ineffective assistance of counsel claims. *See* Petitioner's Memorandum of Law at 19–20 (Docket # 6). The Second Circuit has held that *Baldi* is not "contrary to" *Strickland* for purposes of review under 28 U.S.C. § 2254(d)(1). *Lindstadt v. Keane,* 239 F.3d at 191 (*Baldi* is not " 'diametrically different, opposite in character or nature, or mutually opposed' to the standard articulated in *Strickland.*") (quoting *Williams v. Taylor,* 529 U.S. at 405, 120 S.Ct. 1495);

*accord, e.g., Loliscio v. Goord,* 263 F.3d 178, 192–93 (2d Cir.2001).

Figueroa further contends that this Court is unconstrained by AEDPA's deferential standard because the judge who decided the C.P.L. § 440.10 motion did not apply *Strickland,* as evidenced by the fact that he premised dismissal of the ineffective assistance claim in part on C.P.L. § 440.10(2)(a). As discussed below, the state court's reliance upon C.P.L. § 440.10(2)(a) as an adequate and independent state ground for denying Figueroa's claims potentially created a procedural default. However, because respondent has failed to raise the affirmative defense of procedural default, it has waived it. *See infra.* Figueroa's argument on this point is unavailing. The Court is bound to apply § 2254(d)(1).

Sanchez, however, refused to identify Figueroa by name in his written statement, in which he explained how he and an unnamed "friend" had committed the crime.

When Figueroa was interviewed about a month later, he initially denied any involvement in the shooting. The police then falsely represented to Figueroa that Sanchez had named him as the accomplice. Figueroa retorted that he knew that Sanchez's statement did not name him. Figueroa allegedly then did an about-face and orally admitted his involvement in the crime. He refused to give a written statement to the police, however, saying that he did not want anyone to read it.

Faced with these circumstances, counsel made the strategic decision to argue that the police had fabricated both Figueroa's oral confession and Sanchez's oral confession implicating Figueroa as his accomplice. Defense counsel was confronted with one written statement by Sanchez that did not did not name Figueroa, and an alleged oral statement by Figueroa that arguably could have been cobbled together from Sanchez's written statement. Also, Figueroa consistently had denied any involvement in the crime for the first two hours of his interrogation, and he did not buy into the police's ruse of telling him that Sanchez had fingered him as the shooter. Thus, there was a basis upon which defense counsel logically could contend that the police were being untruthful in asserting that Figueroa, after consistently proclaiming his innocence, suddenly changed his mind and blurted out a confession.

Defense counsel plausibly could argue that the police's inability to obtain a written confession from Figueroa, or a written confession from Sanchez naming Figueroa, should cause the jury to be suspicious about the authenticity of Figueroa's oral statement. Defense counsel explained his strategy to the trial court as follows:

Defense counsel: ... There clearly was a full trial of Mr. Sanchez, at which time there was obviously enough evidence to corroborate his statement, and it lead [*sic*] to his conviction for Murder in the Second Degree. The evidence of the shooting that we've heard at this trial clearly seems to be supported by the statement of Mr. Sanchez as to how the shooting took place.

The Court: It does. What I'm questioning is whether the area that needs to have competent evidence is the exclusion of Mr. Figueroa [from the statement]. Whether that particular juncture, which of course is the kernel you're looking for, needs to have competent, independent evidence, or whether it's just the general statement that it's contained in.

Defense counsel: Well, we would take the position that the statement, the written statement will speak for itself, that it does not mention Mr. Figueroa. The subsequent oral admission, or alleged oral admissions, to Sergeant Givens and Investigator Beaudrault that even though I'm giving you this written statement, it doesn't mention Anthony Figueroa, I want to tell you that, gee, he was there anyway, dovetails into our defense theory on the statement that was allegedly given by Mr. Figueroa. And we're asserting that the statement that the investigators will tell the jury was given to them by Mr. Figueroa could indeed have come directly from the statement of Mr. Sanchez.

The Court: All right. So you would intend to develop also the oral further statement?

Defense counsel: Absolutely.

The Court: That Mr. Figueroa was the other individual, and then challenge the truthfulness of that.

Defense counsel: That's true.

The Court: As part of your case and cross-examination.

Defense counsel: True.

The Court: The intent being to try to indicate that all of the data that they same came from Mr. Figueroa was present in Mr. Sanchez's statement acquired earlier, and that they added the oral condition.

Defense counsel: Correct.

The Court: All right.

T.525–28.

Although the statements were otherwise inadmissible, defense counsel articulated a legitimate tactical reason for introducing them and then attempted to use them to support the defense theory of the case-that the police fabricated the charges against Figueroa because they knew that he was a friend of Sanchez's, and that a "friend" of Sanchez's had been the accomplice. Since the police did not have a written statement from Figueroa, counsel argued, they had to concoct an oral inculpatory statement. And, since Sanchez's written statement did not give a name for the "friend," the police likewise had to fabricate an oral statement by Sanchez identifying Figueroa as the "friend."

■ In evaluating the performance prong of an ineffective assistance of counsel claim, the court may not view the challenged conduct through the "distorting" lens of hindsight but rather must assess the acts or omissions "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *see also Lockhart v. Fretwell*, 506 U.S. 364, 371–72, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (reiterating "contemporary assessment" rule in applying the first prong of the *Strickland* test).

Here, counsel determined, as a matter of trial strategy, that the use of Sanchez's otherwise inadmissible statements would be helpful to the defense in that they could buttress the argument that the police fabricated Figueroa's alleged oral confession. On summation, defense counsel argued that it was highly implausible that Figueroa suddenly confessed to the crime after being told that Sanchez had given him up, as the police claimed, since Figueroa insisted that he knew what was in Sanchez's confession. Defense counsel suggested that it did not comport with common sense for the police to allow murder suspects to selectively edit their confessions. Furthermore, defense counsel contended, the testimony of the two interrogating officers sounded extremely similar, as if they had worked together on a script. Finally, defense counsel urged the jury to consider that when asked what questions were put to Figueroa by the police after he allegedly confessed, neither interrogating officer could remember any specific questions, and that Figueroa's confession contained no details that were not found in Sanchez's written confession.

■ That the challenged strategy was unsuccessful does not provide a basis for concluding that defense counsel's performance was unreasonable. *See, e.g., People v. Shell*, 152 A.D.2d 609, 610, 543 N.Y.S.2d 510 (2d Dept.1999) (trial counsel not ineffective where he refused court's offer to hold severance hearing; counsel's stated strategy of proving that victim had been murdered by co-defendant in jealous rage by introducing co-defendant's statements into evidence was, "based upon the evidence adduced at trial, … logical albeit unsuccessful"); *Bethea v. Scully*, 1987 WL 8088, at *6 (E.D.N.Y. Feb.26, 1987) (counsel's strategic decision to introduce inadmissible statement of witness which inculpated petitioner in order to show that the

police had fabricated both the witness's and the petitioner's statements, based upon the close similarities between the two, was not unreasonable). Although I do not doubt that some lawyers would not have chose to introduce the co-defendant's statements into evidence, I cannot say that this was an illogical tactic under the circumstances presented here.

In sum, Figueroa's arguments do not convince this Court that defense counsel's decision to use the statements were outside the "wide range of reasonable professional assistance," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, to which defendants are entitled under the Sixth Amendment. I note that the jury deliberated for approximately ten hours prior to rendering their verdict, indicating that it did not reject the defense theory out of hand. Furthermore, the trial court apparently recognized that defense counsel had legitimate tactical rea-

sons for deciding to use Sanchez's statement.[8]

Relying upon *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987),[9] Figueroa also submits that he was prejudiced by the similarities between his oral statements the written confession of Sanchez. Assuming for the sake of argument that a *Cruz* issue exists on the present record, a *Cruz* violation does not prejudice a defendant "in cases in which the ... other, properly admitted evidence sufficiently proves the elements of the crime for which the defendant was convicted," *United States v. Kyles,* 40 F.3d 519, 527 (2d Cir.1994), and in which it is not substantially likely that the *Cruz* violation infected the verdict, *cf. Samuels v. Mann,* 13 F.3d 522, 528 (2d Cir.1993), *cert. denied,* 513 U.S. 849, 115 S.Ct. 145, 130 L.Ed.2d 85 (1994). In reviewing the effect

**8.** The Court: It seems that cases do take a number of twists and turns, and of course it was on the defense motion that these cases were severed initially so that Mr. Sanchez's statement would not come in against your client. But I realize for tactical reasons, and in the posture the case now finds itself, you're in a position of advocating that primarily because the written statement does not indicate who the second party was, and doesn't—specifically doesn't say Mr. Figueroa was present, I take it that's what you're—.

Defense counsel: That's correct.
T.524.

**9.** *Cruz* is a seminal case in the Supreme Court's decisional authority interpreting *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that admission at a joint trial of a non-testifying co-defendant's confession implicating the defendant violated the defendant's Sixth Amendment rights under the Confrontation Clause and was prejudicial error even though the trial court clearly instructed the jury not to consider the co-defendant's statement against defendant). In *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), the Supreme Court developed an "interlocking confessions" exception to the *Bru-*

*ton* rule which posited that the Confrontation Clause is violated only when the introduction of a co-defendant's confession is "devastating" to the defendant's case. *See Parker,* 442 U.S. at 73, 75 n. 7, 99 S.Ct. 2132 (When the defendant has confessed, "[his] case has already been devastated," so that the co-defendant's confession "will seldom, if ever, be of the 'devastating' character referred to in *Bruton;* " impeaching that confession on cross-examination "would likely yield small advantage.").

*Parker* 's "interlocking confessions" exception was repudiated by the Supreme Court in *Cruz* which held that "[w]here a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, *see Lee v. Illinois* [, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) ], the Confrontation Clause bars its admission at their joint trial even if the jury is instructed not to consider it against the defendant and even if the defendant's own confession is admitted against him." *Cruz,* 481 U.S. at 193, 107 S.Ct. 1714. I note that *Cruz* is not directly on point with the facts of this case because Sanchez and Figueroa were not tried jointly, and Sanchez's statement was not admitted as evidence against Figueroa.

of a *Cruz* violation, the court need not find that, absent the co-defendant's confession, the evidence against the defendant is "overwhelming," so long as it is "weighty." *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir.1996) (citing *Samuels v. Mann*, 13 F.3d at 527–28), *cert. denied*, 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997).

▄▄▄ In this case, even absent Sanchez's statements, there was sufficiently weighty evidence demonstrating Figueroa's guilt on the felony murder charge, not the least of which was Figueroa's oral confession that he went to the victim's apartment for the purpose of robbing him, that he brought a gun with him to the robbery, and that he confronted the victim in the shower. *See Samuels*, 13 F.3d at 526–27 (holding that whether the defendant's own statement "satisfactorily explains his or her part in the crime without reference to the co-defendant's statement" is relevant to assessing the harmlessness of a *Cruz* violation). In addition, there was physical evidence corroborating Figueroa's confession; his fingerprint was found on a roll of duct tape discovered near the crime scene, and a crumpled piece of similar tape was discovered at the victim's apartment. *See id.* at 527 (holding that whether independent evidence corroborates defendant's confession is relevant to harmlessness).

I note that Sanchez's confession did not involve Figueroa significantly more in the actual shooting of the victim than did Figueroa's own statement. Sanchez related that the victim grabbed the gun of the unnamed friend's gun and then went after Sanchez; this is the last mention of the "friend" until the point when Sanchez shoots the victim and he and the "friend" flee the scene. Thus, Sanchez's statement did not preclude the jury from finding that the prosecution had not satisfied its bur-

den of proving that Figueroa participated in the felony murder of the victim. I cannot find that, but for counsel's decision to introduce the co-defendant's statements into evidence, there was a reasonable probability that the outcome of Figueroa's trial would have been different.

Because Figueroa cannot show that counsel's performance was professionally unreasonable or that he was prejudiced as a result of counsel's alleged deficiencies, Figueroa cannot establish that counsel was constitutionally ineffective in making the strategic decision to introduce the co-defendant's statements at trial.

## 2. Failure to argue the denial of right to counsel as basis for suppression of statement

Figueroa contends that defense counsel was ineffective in failing to pursue the argument at the suppression hearing that Figueroa's statement should have been excluded because he was represented by counsel on a pending charge at the time he was apprehended for the Cedeno murder.

On direct appeal, the Fourth Department held that "[d]efendant failed to establish the absence of strategic or other legitimate explanations for counsel's failure to move to suppress based upon the denial of defendant's right to counsel." *People v. Figueroa*, 258 A.D.2d at 960, 685 N.Y.S.2d 506 (internal quotations omitted). When Figueroa raised this issue in support of the C.P.L. § 440.10 motion, the trial judge noted that under prevailing New York state law, "had defendant been in custody on the unrelated [drug misdemeanor] for which he was represented by counsel, the police could not have questioned him about either those . . . charges or the murder charges in the absence of such attorney." A.272. The state court went on to find, however, that the police never questioned Figueroa about the drug

charge when they interviewed him about the murder charge, and that the police did not use the drug charge as "leverage" to obtain statements concerning the homicide:

> It is clear from the transcripts of both the *Huntley* [10] hearing and the trial that defendant was arrested here solely on the homicide. The arresting officers consistently stated that the reason for defendant's arrest was a "wanted" flyer disseminated by the homicide unit ..., that defendant was picked up in reference to that charge alone, and that he was thereafter asked only about such charge. Under these circumstances, defendant's "constructive arrest" theory simply is not supported by the record.

A.272–73. The court also found that the claim, having been raised on direct appeal and rejected, warranted dismissal under C.P.L. § 440.10(2)(a).[11] *Id.*

■■■■■ Figueroa's claim that his trial counsel was ineffective in this regard cannot form the basis for habeas relief. Because Figueroa's trial counsel failed to establish that Figueroa in fact had a right to the presence of his attorney representing him on the drug charge as a matter of New York law during his interrogation on the unrelated murder charge, and because both the appellate court and the trial court reviewed this claim under New York law and rejected it, Figueroa is unable to establish that his defense was in any way prejudiced by counsel's handling of this argument which proved unsuccessful. *See Beekman v. Lacy,* 918 F.Supp. 57, 62 (N.D.N.Y.1996) (Where state court specifically reviewed claim that trial counsel failed to establish petitioner's right to have attorney present during interrogation under New York law and rejected it, petitioner could not establish that counsel's handling of the issue prejudiced his defense.); *cf. Farinaro v. Kirk,* 675 F.Supp. 75, 82 (E.D.N.Y.1987) (rejecting ineffectiveness claim based on failure to move for suppression of post-arrest statements under New York state law); *Bellamy v. Cogdell,* 802 F.Supp. 760, 770–71 (E.D.N.Y.1991) (rejecting ineffectiveness claim founded upon failure to cite authority for suppression of in-custody statements where petitioner never was in custody).[12]

---

**10.** *People v. Huntley,* 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

**11.** Respondent does not argue that the State court's reliance upon C.P.L. § 440.10(2)(a) as a separate basis for rejecting this claim created a procedural default. Therefore, respondent has waived the affirmative defense of procedural default, and the Court may consider this branch of Figueroa's ineffective assistance of counsel claim on the merits. *See Larrea v. Bennett,* 2002 WL 1173564, at *12 n. 15 (S.D.N.Y. May 31, 2002) (citing *Hooks v. Ward,* 184 F.3d 1206, 1216 (10th Cir.1999)) ("[S]tate-court procedural default ... is an affirmative defense, and [ ] the state is 'obligated to raise procedural default as a defense or lose the right to assert the defense thereafter.' ") (quoting *Gray v. Netherland,* 518 U.S. 152, 165–66, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996)).

**12.** Furthermore, on a petition for federal habeas relief, a district court is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also* 28 U.S.C. § 2254(a). The right to counsel asserted by Figueroa is more expansive under New York State law than under federal law. *See People v. Bing,* 76 N.Y.2d 331, 339, 559 N.Y.S.2d 474, 558 N.E.2d 1011 (1990) ("There are two well-defined situations in which the right is said to attach indelibly under the State Constitution and a waiver, notwithstanding the client's right to waive generally, will not be recognized unless made in the presence of counsel. The first, similar to the federal right, deals with waivers after formal proceedings have commenced. The second, *recognized only in New York,* relates to uncharged individuals in custody who have retained or requested an attorney. Police au-

### 3. Failure to object to hearsay statement concerning ownership of victim's wallet

Figueroa asserts that defense counsel was deficient in failing to object during the following exchange between Investigator Beaudrault and the prosecutor regarding Lissy Diaz:

Q: And when you met with [Diaz] the following day, did she surrender any evidence to you?

A: Yes.

Q: And what evidence did she surrender to you?

A: She gave me a black leather wallet.

Q: And did that wallet have any identification in it?

A: She told me it belonged to the victim, Franklin Cedeno.

T.502–03. According to Figueroa, this hearsay statement "did serious harm" to his defense because it "established Diaz's connection to the crime" and "[s]uch connection lent credence to Mr. Figueroa's purported oral confession in which 'Lissy' was inextricably woven into the planning and execution of the criminal enterprise." On direct appeal, the Fourth Department summarily rejected this claim as without merit.

■ There is no reasonable probability that the result of Figueroa's trial would have been different even if this piece of testimony had been deemed inadmissible by the trial court upon an objection from defense counsel. Defense counsel's theory of the case was that the police had fabricated Figueroa's confession out of bits and pieces from Sanchez's written statement, in which Diaz's involvement in the crime was discussed at length. In fact, defense counsel intended to call Diaz as a witness in order to establish that the police had shown her a photograph of Figueroa, which she apparently did not identify, prior to the interrogation of Sanchez. According to defense counsel, this would contradict the officers' claims that they only learned of Figueroa after speaking with Sanchez and would tend to support the defense theory that the police already had Figueroa on their radar screen and had decided to manufacture a case against him based upon his association with Sanchez.[13] Thus, the information about Diaz's production of the victim's wallet to the police more than likely would have come out if Diaz had taken the stand. In light of the substantial evidence of Figueroa's guilt, he was not denied a fair trial because of this statement and he was not prejudiced by counsel's failure to object to its introduction.

### 4. Failure to object to testimony concerning Figueroa's illegitimate child

■ Defense counsel did not object when the prosecutor elicited the following information from Figueroa's mother:

Q: All right. Were you aware that in [*sic*] July 16th of 1996 the police found Denise Irasari [a fifteen year-

---

thorities may not question them in the absence of counsel.") (citations omitted) (emphasis supplied); *United States v. Broccolo*, 797 F.Supp. 1185, 1196 (S.D.N.Y.1992) ("Under the law of this Circuit, in contrast to what had been the law in the State of New York during most of the last decade, *see People v. Bing*, [ ] (overruling *People v. Bartolomeo*, 53 N.Y.2d 225, 440 N.Y.S.2d 894, 423 N.E.2d 371 (1981) ...), a suspect has no indelible

Sixth Amendment right to counsel which requires the presence of counsel in order for a waiver of such right to be recognized."), *aff'd mem.*, 999 F.2d 536 (2d Cir.1993).

13. The prosecutor declined to grant Diaz immunity. Diaz, through counsel, invoked her Fifth Amendment right and did not testify at Figueroa's trial.

old runaway who had been staying with Figueroa and his mother] and your one year[-]old grandson, Anthony Figueroa, Jr.[,] at Lissy Diaz's house at 251 Durnan Street?

A: I don't know if it was that girl's name but something like that did happen, yes.

T.586. Figueroa claims that this "evidence about fathering a child qualified as 'potentially prejudicial testimony'" because "[i]ntercourse with an underage female is, of course, criminal conduct ( [New York] Penal Law §§ 130.05(2), (3), 130.20)." Petitioner's Memorandum of Law at 39 (Docket # 6). However, nowhere in the challenged testimony or in trial transcript is it stated that the fifteen year-old girl was the mother of Figueroa's son, let alone that Figueroa had sexual intercourse with her. Figueroa's claim thus is premised solely upon the assumption that the jury inferred that Figueroa had engaged in sexual intercourse with an underage girl. "[M]ere speculation that a jury may discern something sinister about a defendant's behavior does not render such behavior an uncharged crime." *People v. Hucks,* 292 A.D.2d 833, 833, 738 N.Y.S.2d 792 (4th Dept.2002) (testimony that defendant possessed a shotgun and a rifle at apartment shared with rape complainant not evidence of uncharged crime of weapons possession absent further proof that possession of items was illegal); *People v. Flores,* 210 A.D.2d 1, 2, 618 N.Y.S.2d 815 (1st Dept.1994) (testimony about incident in which defendant was discovered, draped only in towel, in presence of child sexual abuse victim did not constitute uncharged crime; any sinister motive would be based solely on speculation).

In any event, fathering an illegitimate child with someone is not an uncharged crime, and the fact that Figueroa might have fathered a child with an under-age girl is not the type of inflammatory conduct which would have irreparably prejudiced the defense. Defense counsel might well have made the tactical decision *not* to object to the testimony so as not to call undue attention to it. *Cf., e.g., United States v. Grunberger,* 431 F.2d 1062, 1069 (2d Cir.1970) (holding that "it is understandable that a defense counsel may wish to avoid underscoring a prejudicial remark in the minds of the jury by drawing attention to it" through an objection). On the record before me, there is no reasonable probability that the introduction of evidence about Figueroa's possible unlawful or socially unacceptable conduct changed the outcome of his trial.

### 5. Failure to object to improper prosecutorial summation

Figueroa argues that defense counsel should have registered an objection when the prosecutor made the following comment during his summation:

The policy of having felony murder applied to both shooters and nonshooters is because a planned home invasion robbery is a dangerous activity, and the evidence of what Figueroa's conduct was during this planned home invasion robbery shows the risk that he chose to engage in to [*sic*]. He chose to engage [*sic*] and plan the home invasion robbery. He chose to bring a gun to this home invasion robbery with the second individual, Sanchez[,] also having a gun so there are two guns involved. He chose with Sanchez to confront the victim in the showers [*sic*]. Figueroa alone chose to hit the victim on the head when the victim put his hands upon in the air in the shower. Those acts of violence, that planned home invasion robbery, that's the reason for this felony murder charge.

Figueroa contends that this comment is objectionable as a form of the so-called "safe streets" prosecutorial rhetoric frowned upon by the courts. He also asserts that the comment served to inflame the jury and shift its attention toward its fears about crime and away from an objective determination of the facts.

Courts in New York have expressly disavowed the use of the "safe streets" argument by prosecutors. *E.g., People v. Tolliver,* 267 A.D.2d 1007, 701 N.Y.S.2d 206 (4th Dept.1999). However, at no time did the assistant district attorney implore the jury to convict Figueroa and thereby do justice for the safety of the neighborhood where the crime was committed. *Compare with People v. Payne,* 187 A.D.2d 245, 247, 593 N.Y.S.2d 675 (4th Dept.1993) (reversing conviction where, among other things, prosecutor told jury, "It's not right [for the defense] to sucker us into believing an untruthful version of events which allows one to go back out into the neighborhood with the rest of us if they're [*sic*] guilty of a crime. If we're tricked here in the next couple of days, we all lose in the long run.").

Nor did the prosecutor improperly incite the jury to focus on a fear of crime. In discussing Figueroa's acts at the crime scene, the prosecutor stayed within the "four corners" of the evidence adduced at trial. There is nothing inherently improper in the prosecution's use of rhetorical devices to present evidence in the record from its point of view. *See United States v. Bagaric,* 706 F.2d 42, 60 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 134, 78 L.Ed.2d 128 (1983); *accord, e.g., Levine v. Scully,* 1994 WL 445473, at *5 (S.D.N.Y. Aug. 22, 1994). The motive for the district attorney's decision to bring felony murder charges arguably was not pertinent to the issues presented at trial, but the substance of the challenged comment was not unfairly prejudicial. There is thus no reasonable probability that defense counsel's failure to object to the remark influenced the outcome of the trial.

After reviewing the entire trial record, I conclude that Figueroa received competent representation from his counsel at trial. I note that "[t]he *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt,* 239 F.3d at 199. In this case, all of Figueroa's ineffective assistance claims must fail because he cannot establish the existence of constitutional prejudice-in other words, that the errors were sufficient to undermine this Court's confidence in the verdict. In light of the totality of the evidence, the alleged errors by counsel did not have a reasonable probability of affecting the outcome of the trial. The state courts' rejections of Figueroa's claims of attorney ineffectiveness thus were neither "contrary to," nor an "unreasonable application of," governing Supreme Court precedent.

### CONCLUSION

For the reasons stated above, Anthony Figueroa's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Figueroa has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**